## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **BRITAN TOLLIVER,** an individual, | : | |
| | : | |
| **ANNA STAMMEN,** an individual, | : | |
| | : | |
| **ABAGAIL BRINKER,** an individual, | : | |
| | : | |
| and | : | Case No. 2:20-cv-3790 |
| | : | |
| **DEBORAH HESSEN,** an individual, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Judge: |
| vs. | : | |
| | : | |
| **ABUELO'S INTERNATIONAL LP,** a | : | |
| privately held limited partnership | : | |
| d/b/a Abuelo's Mexican Food Embassy, | : | |
| | : | |
| and | : | |
| | : | |
| **FOOD CONCEPTS** | : | |
| **INTERNATIONAL, LP,** a privately held | : | |
| limited partnership d/b/a Abuelo's | : | |
| Mexican Food Embassy, | : | |
| | : | |
| Defendants. | : | |

_____

### COMPLAINT
### (Jury Demand Endorsed Hereon)

### PRELIMINARY STATEMENT

Plaintiffs Britan Tolliver, Abagail Brinker, Deborah Hesson, and Anna Stammen (collectively, "Plaintiffs") seek damages under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et. seq.*, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, Ohio's Minimum Fair Wage Standards Act ("OMFWS"), Ohio Rev.

Code § 4111 *et seq.*, and pursuant to Ohio Rev. Code § 2307.60 against corporate Defendants Abuelo's International, L.P. and Food Concepts International, L.P. (collectively, "Abuelo's"). Abuelo's is one of the top 50 emerging restaurant chains in the United States by an industry publication and is a criminal enterprise engaged in a corporate and local pattern of racketeering activity, including wire fraud and mail fraud, in order to systematically deprive its employees of earned wages and benefits. This action seeks appropriate monetary, declaratory, and equitable relief based on Abuelo's willful failure to compensate Plaintiffs with minimum wages and overtime compensation as required by state and federal law.

## JURISDICTION & VENUE

1.      This Court has original jurisdiction over Plaintiffs' FLSA claims pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 216(b).

2.      This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 as they form part of the same case or controversy as Plaintiffs' FLSA claims.

3.      Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b).

4.      Pursuant to Fed. R. Civ. P. 20(a)(1), Plaintiffs are joined in this action as their claims arise out the same transaction, occurrence, or series of transactions or occurences and contain questions of law and fact common to all plaintiffs in this action.

## PARTIES

5.      Plaintiff Britan Tolliver ("Mr. Tolliver") is an individual residing in Franklin County, Ohio.

6.      Plaintiff Abagail Brinker ("Ms. Brinker") is an individual residing in Franklin County, Ohio.

7.     Plaintiff Deborah Hesson ("Ms. Hesson") is an individual residing in Franklin County, Ohio.

8.     Plaintiff Anna Stammen ("Ms. Stammen") is an individual residing in Franklin County, Ohio.

9.     Defendant Abuelo's International LP is a foreign for-profit limited partnership registered to do business in the State of Ohio, whose statutory agent is Registered Agent Solutions, Inc., 4568 Mayfield Rd., Suite 204, Cleveland, OH 44121 and whose Ohio Store #621 principal place of business was located at 3950 Gramercy Street, Columbus, OH.

10.     Defendant Food Concepts International, LP is a foreign for-profit limited partnership registered to do business in the State of Ohio, whose statutory agent is Registered Agent Solutions, Inc., 4568 Mayfield Rd., Suite 204, Cleveland, OH 44121. Food Concepts International's principal place of business is located at 2575 South Loop 289, Lubbock, Texas. Defendants Abuelo's International LP and Food Concepts International LP are collectively referred to hereinafter as "Abuelo's" or "Defendants."

11.     Abuelo's constitutes one enterprise within the meaning of the FLSA under 29 U.S.C. § 203(r)(1) and one enterprise within the meanding of 18 U.S.C. § 1961 (RICO).

12.     Abuelo's employees perform related activities for a common business purpose through a unified operation or common control.

13.     Abuelo's employed Mr. Tolliver as a restaurant front of house shift lead, back of house shift lead, and front wait/server from at least August 9, 2017 to August 4, 2019.

14.     Abuelo's employed Ms. Brinker as a restaurant front of house shift lead, back of house shift lead, and front wait/server from at least August 9, 2017 to April 19, 2019.

15.     Abuelo's employed Ms. Hesson as a restaurant front of house shift lead, back of house shift lead, and front wait/server from at least August 9, 2017 to August 4, 2019.

16.     Abuelo's employed Ms. Stammen as a restaurant front of house shift lead, back of house shift lead, and front wait/server from at least August 9, 2017 to August 4, 2019.

17.     During all relevant times, Plaintiffs were Abuelo's "employees" within the meaning of the FLSA under 29 U.S.C. § 203(e)(1) and the OMFWSA under Ohio Rev. Code § 4111.03(D)(3).

18.     During all relevant times, Defendants were Plaintiffs' "employers" within the meaning of the FLSA under 29 U.S.C. § 203(d) and the OMFWSA under Ohio Rev. Code § 4111.03(D)(2).

19.     During all relevant times, Abuelo's was, and continues to be, an enterprise engaged in "the production of goods for commerce" within the meaning of the FLSA and OMFWSA.

20.     During the relevant times, Abuelo's gross revenue exceeded $500,000 per year.

21.     During the relevant times, Abuelo's gross revenue exceeded $319,000 per year.

## STATEMENT OF FACTS

22.     The facts in this case are identical to the factual background discussing Abuelo's common policies and procedures in several consolidated cases against Abuelo's in the U.S. District Court for the Southern District of Ohio.[1]

23.     Defendants owned and operated a Mexican restaurant in the Easton Town Center shopping mall in Columbus, Ohio (Store #621), serving lunch, dinner, and catered food. Abuelo's Store #621 closed in or around August, 2019.

---

[1] Plaintiffs Joseph Miller (2:13-cv-00124), Teddy Crozier (2:13-CV-00125), Komekeo Coleman (2:13-CV-00126), Eric Gibbs (2:13-CV-00127), Stacie Johnson (2:13-CV-00129), Lucas Troyer (2:13-CV-00130), Angie Tigner (13-CV-132), Amanda McEldowney (2:13-CV-00133), and Jamie Keegan (2:13-CV-00134) sued Food Concepts International, LP and Abuelo's International LP in Franklin County, among other defendants. Defendants therafter removed the cases to the U.S. District Court of the Southern District of Ohio.

24. Abuelo's also operates approximately forty-three (43) additional locations in the states of Texas, Oklahoma, Arizona, Arkansas, Missouri, Kansas, Tennessee, Indiana, South Carolina, Michigan, Kentucky, Wisconsin, Florida, and Virginia.

**Plaintiffs' Off-the-Clock Work**

25. Abuelo's employed restaurant front wait/servers and bartenders at Abuelo's Store #621 who were primarily responsible for waiting on tables, tending bar, and performing pre-shift and post-shift "side work." Pre-shift and post-shift "side work" included cleaning, table set-up, and other general, as-needed responsibilities. Plaintiffs were employed by Abuelo's within three years of commencing this action and worked at Abuelo's Store #621.

26. Upon information and belief, Abuelo's applies the same pay practices and policies at its various locations, including Store #621, to all front wait/servers and bartenders,[2] including Plaintiffs.

27. Abuelo's Store #621 tracks and records its employees' time through an in-store Aloha point of sale system (hereinafter "Store Level Aloha"). The Employer tracks an employee's hours worked, including Plaintiffs, by clocking in and out of the Store Level Aloha system. Upon information and belief, every morning – at approximately 3 AM ET – the data maintained by the Store Level Aloha system is transmitted to the Abuelo's corporate payroll department in Lubbock, Texas. Upon information and belief, the daily Store Level Aloha data that is transmitted to Abuelo's corporate becomes a part of the corporate level Aloha data maintainted by Abuelo's corporate and used for payroll purposes (hereinafter "Enterprise Level Aloha"). Upon information and belief, once the Store Level Aloha data is transmitted to Abuelo's corporate, the Store Level Aloha for a particular day is never re-transmitted to Abuelo's corporate. Upon information and belief, prior to the issuance of employee bi-weekly pay checks,

---

[2] Bartenders and front wait/servers will collectively be referred to hereinafter as "servers").

both store level managers and corporate level payroll personell are able to "punch edit" the Store Level Aloha or Enterprise Level Aloha data before or after issuing the employees bi-weekly pay checks. Upon information and belief, Abuelo's corporate utilizes the Enterprise Level Aloha data, among other reports provided to it by store management, to produce payroll reports and to issue employee paychecks. The time an employee spends working after clocking in on the Store Level Aloha system and until he or she clocks out of the Store Level Aloha system (or is automatically clocked out) is time spent "on the clock."[3] Employees' whose time was not punch edited at the Store level or Enterprise level had their paychecks based upon the time recorded by the Store Level Aloha system and only for the "on the clock" recorded time.

28.     Neither the Store Level Aloha, nor the Enterprise Level Aloha point of sale systems record time an employee spends working "off the clock," meaning time spent working before clocking in or after clocking out. Abuelo's management did not require servers to track, record, or report time spent working "off the clock" in any other manner.

29.     Further, the Store Level Aloha system would not permit employees, including Plaintiffs, to clock in before their scheduled start time or to clockout after their scheduled end time without a manager's approval and by swiping the manager's Aloha card. In order for Plaintiffs to clock into the Store Level Aloha before they were scheduled, a manager would have to use his or her card to override the system to permit a clock in time in advance of or after the employee's scheduled start time if more than 5-10 minutes. In order for Plaintiffs to clock out after their scheduled end time, a manager would have to use his or her card to override the system to permit a clock out after the employee's scheduled end time if more than 5-10 minutes.

---

[3] If an employee who is clocked into the store's Aloha system fails to clock out before the 3 AM ET upload to Abuelo's corporate, the Aloha will automatically clock the employee out prior to transmitting the Store Level Aloha data to corporate (hereinafter "Forced Clock Out"). When an employee has a Forced Clock Out, that employees daily chit is printed at the store's master Aloha terminal printer.

30.     Abuelo's Store #621 management encouraged employees, including Plaintiffs, to work off-the-clock to reduce Abuelo's labor costs and prevent employees from accruing overtime.

31.     When Plaintiffs began a shift, he or she was ostensibly supposed to clock in. Abuelo's Store #621's unwritten policy, however, was for front wait/servers to wait to clock in until they received their first table. This policy was also necessary because Plaintiffs were not scheduled until shortly before they were anticipated to receive their first table, which did not provide sufficient time for Plaintifffs to perform their required pre-shift side work. Plaintiffs typically spent the time between arriving at the store for their shift and clock in doing pre-shift side work, such as preparing their tables, sweeping floors, filling sugar and salt shakers, and cutting fruit for the bar, for example.

32.     When scheduled to tend bar, before clocking in, Plaintiffs would prepare the bar by cutting fruit, making simple syrup, stocking alcohol, and making magaritas from scratch.

33.     A former general manager for Abuelo's Store #621 testified under oath during a deposition in a similar case against Abuelo's that he and all members of management were aware that front wait/servers were working without clocking in. The Abuelo's general manager testified that this fact was "common knowledge."  Further, because a manager's approval was required for the Store Level Aloha system to clock in Plaintiffs in advance of or after his or her scheduled start time, Abuelo's management knew that Plaintiffs were working off-the-clock when they would be performing their necessary pre-shift side work before their scheduled start time.

34.     When Plaintiffs and similarly situated front wait/servers ended their shifts, he or she closed all of the transactions from his or her sales for that shift by going through a checkout (a.k.a. cash-out) and Employee Clock Out process. Plaintiffs initated the checkout process by swiping his or her card to activate the Store Level Aloha system, which then generated a

checkout report. After clocking out, Plaintiffs – while off the clock – would complete the checkout process by organizing their cash and credit card receipts, finished their side work, and would get the restaurant prepared for the upcoming morning, including, but not limited to, wiping down tables and counters, table arrangements, collect pitchers, restock fridges and freezers, rearrange tables, restock printer ribbons and bags, empty trash, dump tea urns, clean the underside of tables, and dispose of fruit, among other duties.

35. When Plaintiffs clocked-out, the Store Level Aloha system would print an Employee Clock Out report or "chit" – a paper receipt identifying the job under which the employee clocked-in, the employee's clocked-in and out times, the number of hours worked during that shift, the total hours worked during that work week, total sales, tip share amount, declared tips, and charged tips. Neither the Enterprise Level Aloha nor the Store Level Aloha system keeps an electronic copy of the chit. However, after the close of business  the Store Level Aloha system would transmit to the Enterprise Level Aloha system each employees' time through electric wires interstate to Abuelo's corporate offices in Lubbock, Texas for payroll and other purposes.

36. After clocking out, the front wait/servers took their check out report to a front of house ("FOH") shift lead and back of house ("BOH") shift lead for review and signature approval.

37. The checkout report showed the total shift sales detailed history broken down by category (e.g. Liquor, Wine, Starters, Soup/Salad, Combos, Enchiladas, Kids, Fajitas, Dessert, Beverages, Misc, Tapas/Sm Plates, Mods, HH Good, HH Liquor) of each transaction for each front wait/server during his or her shift separated by cash and credit card type. Front wait/servers were then required to organize their original store copy sales receipts (separating by cash and credit card) and arranged so that the credit card receipts were in the same order as they appeared on the checkout report.

38.     During this review, each FOH/BOH shift lead would check to see if the front wait/server separated and organized each original store copy receipt in the order of the checkout report and verified that all credit card tips were accurately entered into the Store Level Aloha system as shown in the checkout report. If the front wait/server's receipts were not organized in this manner, the front wait/server, often with the FOH or BOH shift lead's assistance, would be required to rearrange their receipts to correct the problem. Once the sales receipts were organized and the tip amounts on the store copy receipt was confirmed with the amount reported on the checkout report, the FOH and BOH shift leads would each sign off on the front wait/server's checkout report. Then, the front wait/server would take his or her checkout report to the manager on duty to verify the accuracy of the checkout and to "cash-out" or "tip out" where the manager would then pay each front wait/server his or her share of tips (received tips less tip share contribution) for the shift in cash. Once front wait/servers were cashed-out or tipped out and they had completed the Clockout process, they were allowed to leave.

39.     While working as a FOH/BOH shift lead, Plaintiffs would spend twenty to forty minutes with each front wait/server reviewing and/or correcting their receipts and checkout reports in advance of the manager's review. The FOH/BOH shift lead also had to inspect each front wait/server's section to make sure that they completed all of their post-shift side work and that the chairs were set up. With up to twenty front wait/servers on a single weekend shift, the checkout review process would take hours to complete and frequently left the FOH/BOH shift leads being one of the last employees to leave the restaurant.

40.     In addition to overseeing the front wait/server checkout and cash out processes, Plaintiffs and similarly situated FOH/BOH shift leads were also primarily responsible for supervising the other front wait/servers. An Abuelo's former general manger testified that FOH/BOH shifts leads

assigned pre-shift and post-shift side work, such as bring ice to the bar, bringing glasses out of the side area, making iced tea, giving out chips and salsa to servers, etc. FOH/BOH shift leads were also responsible for the oversight of customer service, oversight of resturant clean-up assignments, and other supervisory resposibilities to include assumption of management duties and responsibilities in the absence of in-store management. At night, the BOH also had to break down the coffee and tea urns, take care of the glassware, and help to shut down the restaurant.

41.     Additionally, while working as a FOH/BOH shift lead, Abuelo's managers would give Plaintiffs their Aloha manager's card and were told to respond to customer complaints and handle complimentary meals, accepting coupons, or voiding transactions. These managerial functions that FOH and BOH shift leads performed could not be done without a manager's Aloha card.

42.     In contrast, Abuelo's front wait/servers were not responsible for supervising other front wait/servers, were not responsible for reviewing other front wait/servers' checkout reports or required to monitor their pre-shift or post-shift side work.

43.     An Abuelo's general manager testified in a deposition and estimated that it would take a FOH/BOH shift lead forty-five minutes more than a server to perform their pre-shift duties. The general manager also testified that on average, it would take a FOH/BOH shift lead an additional hour to an hour-and-a-half to perform their post-shift duties compared to a server.

44.     The same former general manager also testified in deposition that the job functions of a server and a FOH/BOH shift lead were indeed different from a server although they received the same rate of pay. Generally, FOH/BOH shift leads were responsible for maintaining the restaurant floor for the managers and insuring that the servers' work was getting done.

45.    From time to time, Abuelo's required Plaintiffs and other similarly situated front wait/servers to come into the restaurant for training. An Abuelo's general manager testified that in some cases this time was compensated; however, upon information and belief, in most cases, Plaintiffs were not compensated for these training sessions.

### Abuelo's Unlawful Time Shaving Practices

46.    When Abuelo's employees would forget to clock in or clock out, clock in or clock out at the incorrect time, or fail to declare sufficient tips, an Abuelo's manager was able to make a punch adjustment ("punch edit"), wherein he or she could edit the employee's jod code, clock in time, clock out time, rate of pay, and/or declared tips. Such punch edits occurred when an employee clocked in under the wrong job code, needed to have his or her job code changed at the discretion of management, failed to clock in or management desired a different clock in time, failed to clock out at the end of his or her shift or management desired a different clock out time, management desired the employee's rate of pay to be different, or management wanted to modify the "declared tips" attributed to an employee.[4] Abuelo's maintains two sets of edit punch reports that show certain adjustments that a manager has made to the employee's job code, clock in time, clock out time, rate of pay, or delared tips.

47.    Upon information and belief, on numerous occasions, Abuelo's management made unlawful punch edits to Plaintiffs' time records by modifying the their job code, clock in time, clock out time, rate of pay, and or declared tips. Abuelo's management completed these punch edits without consulting Plaintiffs, without their knowledge, and without their permission. Upon

---

[4] Upon reviewing previous Abuelo's cases and former employee deposition testimony, multiple former employees testified under oath that Abuelo's management was punch editing declared tips and allocating tax responsibility for those punch edited tips to them when, in fact, they had not received the tips being allocated to them by Abuelo's management.

information and belief, the punch edits conducted by Abuelo's management were false, contrived, and engaged in for the benefit of Abeulo's to Plaintiffs' financial detriment.

48.     In some instances, Abuelo's managers would punch edit Plaintiffs' time records by removing entire shifts so that those hours would not be recorded on their weekly time and attendance records.

49.     For example, on September 14, 2018, Ms. Hesson's Employee Clock Out report or chit recorded that she clocked in at 11:24 AM and that she clocked out at 8:25 PM resulting in just over nine hours and one minute of recorded on-the-clock time for her shift. However, Ms. Hesson's Weekly Time and Attendance report which was provided to her by Abuelo's corporate purports to show that Ms. Hesson clocked in at 12:24 AM and clocked out at 8:25 PM for a total recorded time of eight hours and one minute.

50.     Upon information and belief, Abuelo's punch edited Ms. Hesson's time and attendance record for September 14, 2018 by reducing her on-the-clock time by 1 hour. Ms. Hesson neither was informed of this change, nor did she give her consent.

51.     On other occasions, Abuelo's managers punch edited Ms. Hesson's job title from "Trainer" as reported on her Employee Clock Out or chit to "Server" as reported on Ms. Hesson's Abuelo's Weekly Time and Attendance records. By changing Ms. Hesson's job title, Abuelo's only paid her Ohio's lower tipped minimum wage rather than the $6.50 per hour she received when she was properly reported as a Trainer and less that the lawful minimum wage she should have received for working in a non-tipped occupation of Trainer training other front wait/servers.

### Abuelo's Unlawful Tip Pool

52.     When Plaintiffs worked as either a front wait/server, FOH or BOH shift lead, Abuelo's

required Plaintiffs to contribute three percent (3%) of their total shift sales, known as "Tipshare," which was documented on both the employee's shift Checkout report and the Employee Clock Out report or chit, into an unlawful tip pool Abuelo's operated.

53.     When Plaintiffs worked as either a front wait/server, FOH or BOH shift lead, they did not receive a "Tipshare" distribution from the Abuelo's tip pool, they only paid into it. However, when and if Plaintiffs worked as bartenders, they would receive a Tipshare distribution on their bi-weekly paycheck from Abuelo's unlawful tip pool.

54.     Although Abuelo's withheld three percent (3%) of Plaintiffs' total sales for each shift, Plaintiffs regularly spent the majority of those shifts performing non-tipped duties, including management duties, during those shifts. Specifically, Abuelo's required Plaintiffs to perform pre-shift and post-shift side work as well as management duties not identified in the Occupational Information Network ("O*NET")[5] report for waiters and waitresses during their shift and to participate in Abuelo's unlawful tip pool.

55.     It was Abuelo's pattern and practice to collect servers' Tipshare contributions, including Plaintiffs' Tipshare, each shift beginning on Thursday of each week through the following second Wednesday. In otherwords, Abuelo's would collect front wait/servers, FOH, and BOH shift leads' Tipshare for two weeks before distributing it to the tip pool distribution recipients.

56.     Upon information and belief, at the end of business each day, Abuelo's Store #621's closing manager would prepare two deposits – one for business receipts and a second one for the BOH, FOH, and front wait/servers' Tipshare contributions. The deposit slips then went into the restaurant's Daily Cash Bag.

---

[5] O*NET is an online source of occupational information that the Wage and Hour Division staff of the U.S. Department of Labor is required to consult to determine whether duties are related or unrelated to the tip-producing occupation. *See* Field Operations Handbook, Wage and Hour Division, United States Department of Labor, 30d00(f), available at https://www.dol.gov/agencies/whd/field-operations-handbook/Chapter-30 (last visited May 5, 2020).

57. The Daily Cash Bag contains the store's nightly reports (e.g. sales report, hourly labor report, payment detail report, and EDC or credit card report), front wait/server Checkouts, bartender Checkouts, and the original "wet" credit card receipts.

58. Upon information and belief, instead of maintaining a separate Tipshare bank account, Abuelo's would deposit all employee Tipshare contributions into one store cash account along with deposits for store receipts. The amount of Tipshare contributions were tracked using a specific general ledger account for Abuelo's Store #621.

59. Every other week, Abuelo's purported to use those Tipshares contributed to the tip pool to pay other tipped and non-tipped employees in their be-weekly paychecks, including bus boys, food runners, service bartenders, hosts, and server assistants. To determine how much these tipped and non-tipped employees would receive, Abuelo's would take the total Tipshare that the front wait/servers contributed during a given week and divided that by the amount of hours that all the tipped and non-tipped receipient employees worked during that week. The amount of those hours was then multiplied by the number of hours each employee typically worked.

60. Upon information and belief, it was also Abuelo's pattern and practice to reduce Plaintiffs' time through punch edits after the Store Level Aloha system printed Plaintiffs' chit after each shift. These punch edits generally occurred the next day. By reducing Plaintiffs' time, Abuelo's and its management would artificially reduce Plaintiffs' earned wages.

61. Upon information and belief, it was Abuelo's pattern and practice to reduce the total sales for a front wait/server through the Store Level Aloha system after the employees had completed their Checkout and Employee Clock Out. These after the fact modifications of total sales allowed members of Abuelo's management to collect Tipshare from employees at the end of their shift and never report it as a tip pool contribution or allow it to be deposited into the company's bank

account. Instead, certain Abuelo's managers would walk out of the store with a portion of Plaintiffs' Tipshare contribution in hand. This management retained a Tipshare portion that was not distributed to the other tipped or non-tipped employee tip pool recipients resulting in a violation of 29 U.S.C. § 203(m)(2)(B).

62. Because Abuelo's and its management unlawfully kept portions of BOH, FOH, and front wait/servers' Tipshare contributions, Plaintiffs and other similarly situated tipped employees (bartenders, hosts, etc.) received lower Tipshare distributions.

63. The redistribution of the collected Tipshares in the tip pool never occurred on the same day that the funds were earned by Plaintiffs. Instead, as an Abuelo's controller and general manager testified, Abuelo's would retain two weeks worth of Tipshare contributions in the tip pool before distributing those monies to the other tipped/non-tipped employees as wages.

64. Upon information and belief, Abuelo's earned interest on Tipshare contributed to the tip pool. When Abuelo's did distribute the money from the tip pool, it only paid out a portion of the Tipshare originally collected; Abuelo's never adjusted for interest earned on the Tipshare contributions.

**Unlawful Tip Credit**

65. In order to reduce payroll expenses, Abuelo's paid Plaintiffs approximately one half the Ohio minimum wage per hour, less than the federal minimum wage, by claiming a "tip credit" allowed under the FLSA and Section 34a of the Ohio Constitution.

66. Abuelo's failed to provide Plaintiffs with proper and sufficient notice of their intent to take a tip credit in advance of taking such credit.

67. Ohio's minimum wage for tipped employees was $4.05 per hour in 2016, $4.08 per hour in 2017, $4.15 per hour in 2018, and $4.30 per hour in 2019.

68.     According to Abuelo's  Weekly Time & Attendance records for Mr. Tolliver, Abuelo's paid Mr. Tolliver $4.05 per hour from August 11, 2016 through January 27, 2017 for time working as a "Server."

69.     According to Abuelo's Weekly Time & Attendance records for Mr. Tolliver, Abuelo's paid Mr. Tolliver $4.08 per hour from January 28, 2017 through December 31, 2017 for time working as a "Server."

70.     According to Abuelo's Weekly Time & Attendance records for Mr. Tolliver, Abuelo's paid Mr. Tolliver $4.15 per hour from January 4, 2018 through January 6, 2019 for time working as a "Server."

71.     According to Abuelo's Weekly Time & Attendance records for Mr. Tolliver, Abuelo's paid Mr. Tolliver $4.30 per hour from January 10, 2019 through August 4, 2019 for time working as a "Server."

72.     Although Abuelo's reported Mr. Tollver's occupation as a "Server" from August 11, 2016 through August 4, 2019 in the Abuelo's Weekly Time & Attendance records for Mr. Tolliver, he worked as scheduled as a FOH or BOH shift lead. When Mr. Tolliver worked as a BOH or FOH shift lead, he spent more than twenty (20) percent of each of his shifts performing non-tipped duties incidental or unrelated to his tipped duties, including managerial duties.

73.     According to Abuelo's Weekly Time & Attendance records for Ms. Hesson, Abuelo's paid Ms. Hesson $4.05 per hour from July 29, 2016 through January 27, 2017 for time working as a "Server."

74. According to Abuelo's Weekly Time & Attendance records for Ms. Hesson, Abuelo's paid Ms. Hesson $4.08 per hour from January 28, 2017 through January 1, 2018 for time working as a "Server."

75. According to Abuelo's Weekly Time & Attendance records for Ms. Hesson, Abuelo's paid Ms. Hesson $4.15 per hour from January 5, 2018 through January 6, 2019 for time working as a "Server."

76. According to Abuelo's Weekly Time & Attendance records for Ms. Hesson, Abuelo's paid Ms. Hesson $4.30 per hour from January 12, 2019 through August 4, 2019 for time working as a "Server."

77. Although Abuelo's reported Ms. Hesson's occupation as a "Server" from July 29, 2016 through August 4, 2019 in Abuelo's Weekly Time & Attendance records for Ms. Hesson, she worked as scheduled as a BOH or FOH shift lead. When Ms. Hesson worked as a BOH or FOH shift lead, she spent more than twenty (20) percent of each of her shifts performing non-tipped duties incidental or unrelated to her tipped duties, including managerial duties.

78. According to Abuelo's Weekly Time & Attendance records for Ms. Stammen, Abuelo's paid Ms. Stammen $4.05 per hour from July 30, 2016 through January 27, 2017 for time working as a "Server."

79. Although Abuelo's reported Ms. Stammen's occupation as a "Server" from July 30, 2016 through September 25, 2017 in Abuelo's Weekly Time & Attendance records for Ms. Stammen, worked as scheduled as a FOH or BOH shift lead. When Ms. Stammen worked as a BOH or FOH shift lead, she spent more than twenty (20) percent of each of her shifts performing non-tipped duties incidental or unrelated to her tipped duties, including manigaerial duties.

80.     According to Abuelo's Weekly Time & Attendance records for Ms. Brinker, Abuelo's paid Ms. Brinker $4.08 per hour from October 4, 2017 through December 28, 2017 for time working as a "Server."

81.     According to Abuelo's Weekly Time & Attendance records for Ms. Brinker, Abuelo's paid Ms. Brinker $4.15 per hour from January 5, 2018 through January 9, 2019 for time working as a "Server."

82.     According to Abuelo's Weekly Time & Attendance records for Ms. Brinker, Abuelo's paid Ms. Brinker $4.30 per hour from January 12, 2019 through April 19, 2019 for time working as a "Server."

83.     Although Abuelo's reported Ms. Brinker's occupation as a "Server" from October 11, 2017 through April 19, 2019 in Abuelo's Weekly Time & Attendance records for Ms. Brinker, she worked as scheduled as a BOH or FOH shift lead. When Ms. Brinker worked as a BOH or FOH shift lead, she spent more than twenty (20) percent of each of her shifts performing non-tipped duties incidental or unrelated to her tipped duties.

84.     While working as an Abuelo's bartender in the last three years, Ms. Brinker was paid less than the $6.00 per hour on September 4, 2018 and March 3, 2019.

**Britan Tolliver**

85.     Although Mr. Tolliver spent the majority of his shifts working as a FOH or BOH shift lead, as scheduled, Abuelo's time records for Mr. Tolliver fail to document the shifts he worked at these positions. Instead, Abuelo's attempted to generally classify Mr. Tolliver's occupation as a general "server" for time recording purposes while he was scheduled to work as either a FOH or BOH shift lead in order to disguise his true job duties and avoid paying him a lawful minimum wage.

86.     Further, even though Abuelo's classified Mr. Tollver's job description as a "Server," Mr. Tolliver would spend significant portions of his shifts unloading and putting away delivery trucks, washing dishes, stocking shelves with delivered dry stock, receiving beer and wine deliveries, changing and rotating beer kegs, prepping bar drinks, including margarits, house mix, sangria, simple syrup, clearing and stocking the bar, and performing various managerial duties. Mr. Tollover would also count the bar's cash drawer in the mornings.

87.     Mr. Tolliver also performed significant managerial duties. For example, like the other managers, he set up the "expo," unlocked the restaurant doors in the morning, opened the store's safe to take out and count cash drawers and used an Aloha manager's card to assign the drawers to a specific registers. He would also assign bartenders to a specific registers, print the floor chart, turn on music, clock front wait/servers in after their scheduled start time using an Aloha manager's card, and sign and receive shipping deliveries. Mr. Tolliver also regularly used an Aloha manager's store card to comp meals, void transactions, open and close checks to correct sales transactions, adjust time (i.e., perform punch edits), cancel cash outs, and other exclusive managerial duties.

88.     After Abuelo's closed the restaurant in August, 2019, Mr. Tolliver was unemployed. As a result, Mr. Tolliver applied to the State of Ohio for unemployment benefits.

89.     Attached as Exhibit 1 hereto and incorporated herein by reference, is the affidavit of Britan Tolliver and attached work papers attesting to the actual amout of time Mr. Tolliver worked at Abuelo's during the last three years of his employment.

**Abagail Brinker**

90.     Although Ms. Brinker spent many of her shifts working as a FOH or BOH shift lead, as scheduled, Abuelo's time records for Ms. Brinker fail to document the shifts she worked at these

positions. Instead, Abuelo's attempted to generally classify Ms. Brinker's occupation as a general "Server" for time recording purposes while she was scheduled to work as either a FOH or BOH shift lead in order to disquise her true job duties and avoid paying her a lawful minimum wage.

91.     On occasion, Abuelo's Store #621 general manager Oscar Hernandez required Ms. Brinker to make trips to Gordon Food Service ("GFS") to pick up sugar and other supplies for the restaurant. Before Ms. Brinker left the restaurant, Mr. Hernandez instructed her to clock out. When asked if she would be compensated, Mr. Hernandez told her that he would go into the Store Level Aloha system and edit her time after the end of her shift.

92.     Mr. Hernandez's instructed Ms. Brinker to clock out during these trips to GFS for the purpose of trying to avoid potential vicarious liability while Ms. Brinker operated her personal vehicle within the course and scope of her employment.

93.     In her official capacity as Abuelo's Store #621 general manager, Lacy Coe also directed Ms. Brinker to perform work off-the-clock. For example, Ms. Coe required and instructed Ms. Brinker to clock out and leave the restaurant before the end of her scheduled shift in order to pick up Ms. Coe's two childen from her ex-husband. Alternatively, if Ms. Coe required Ms. Brinker to pick up her children at the beginning of Ms. Brinker's shift, Ms. Brinker would pick the children up first and clock in late after her scheduled start time pursuant to Ms. Coe's direction.

94.     On Fridays from around May, 2017 through about February, 2018, Ms. Brinker would leave her house or the Abuelo's restaurant to pick up Ms. Coe's children at her apartment in Gahanna. From there, Ms. Brinker drove the children to a travel center in the Springfield/London Ohio area where she was instructed to drop them off with their father (Ms. Coe's ex-husband).

After droping them off, Ms. Brinker would return to the Abuelo's Store #621 resturant. It took Ms. Brinker approximately two to two-and-a-half hours to complete this trip each Friday.

95.     On Sundays, Ms. Brinker typically worked double shifts. Around 2 pm, Abuelo's general manager Ms. Coe would again direct Ms. Brinker to clock out (even if she was serving a table) and drive back to the travel center near Springfield/London to pick up Ms. Coe's childen. Pick up would take Ms. Brinker about approximately two to two-and-a-half hours.

96.     Ms. Brinker would then take Ms. Coe's children back to either the Abuelo's Store #621 restaurant or Ms. Coe's apartment and wait for Ms. Coe to return home from work. Because Ms. Brinker was directed to supervise Ms. Coe's children at her apartment, she was unable to return to the restaurant to finish her shift.

97.     Abuelo's failed to pay Ms. Brinker a lawful minimum wage for services she performed at Ms. Coe's direction off-the-clock.

98.     Ms. Coe failed to pay Ms. Brinker a lawful minimum wage for services she performed at Ms. Coe's direction.

99.     In 2018, while clocked in as a host, Ms. Coe would from time to time ask Ms. Brinker to serve tables when there were not enough front wait/servers. Ms. Coe instructed Ms. Brinker to ring customer's order under another front wait/server's number. As a result, Ms. Brinker was required to give all of the tips she earned to the other front wait/server.

100.     In March, 2020, Ms. Brinker applied to the Ohio Department of Job and Family Services for unemployment due to being laid off as a result of the COVID-19 pandemic. As a result of Abuelo's failure to pay Ms. Brinker a lawful minimum wage during the three years preceding this lawsuit, Ms. Brinker's unemployment benefits were reduced.

101.    Attached as Exhibit 2 hereto and incorporated herein by reference, is the affidavit of Abigail Brinker and attached work papers attesting to the actual amout of time Ms. Brinker worked at Abuelo's during the last three years of her employment.

### Anna Stammen

102.    At all relevant times where Abuelo's classified Ms. Stammen's job as a "Server" in Abuelo's Weekly Time and Attendance records for Ms. Stammen, Ms. Stammen was actually working as a FOH or BOH shift lead as scheduled.

103.    Although Ms. Stammen spent the majority of her hours working as a FOH or BOH shift lead, as scheduled within the past three years, Abuelo's time records for Ms. Stammen fail to document the shifts she worked at these positions. Instead, Abuelo's attempted to generally classify Ms. Stammen's occupation as a general "Server" for time recording purposes while she was scheduled to work as either a FOH or BOH shift lead in order to disquise her true job duties and avoid paying her a lawful minimum wage.

104.    On weekends while working as a bartender, Ms. Stammen would split her tips with the other scheduled bartender. Each bartender would use their own card to initiate and complete his or her check out. All cash tips were placed into a jar. If the bartender received a credit card tip, the bartender would take the amount of the tip from the cash drawer and put it into the tip jar.

105.    During shifts where Ms. Stammen worked with a less experienced bartender, she frequently earned more tips. The declared tips as reported in Abuelo's Weekly Time & Attendance records for Ms. Stammen document a portion of the tips Ms. Stammen received from customers but not necessary the amount she took home at the end of the night after splitting all tips with the other bartender(s).

106.    As a result of Abuelo's policy of declaring tips that Ms. Stammen never received, she inevitably paid federal income tax and other taxes on tip income reported but not received by Ms. Stammen.

107.    Attached as Exhibit 3 hereto and incorporated herein by reference, is the affidavit of Anna Stammen and attached work papers attesting to the actual amout of time Ms. Stammen worked at Abuelo's during the last three years of her employment.

**Deborah Hesson**

108.    At all relevant times where Abuelo's classified Ms. Hesson's job as a "Server" in Abuelo's Weekly Time and Attendance records and chits for Ms. Hesson, Ms. Hesson was actually working as a FOH or BOH shift lead as scheduled.

109.    During the times when Ms. Hesson was scheduled and worked as a "Traniner," she was responsible for supervising and training new front wait/servers. In this position, she would have to stay with the trainee and train him or her in all of the responsibilities of a front wait/server, including, but not limited to, teaching them how the restaurant worked, explain how to properly sell alcoholic beverages, and simply explain everthing Ms. Hesson was doing while they were working.

110.    A former Abuelo's general manager testified in deposition that trainers were supposed to receive minimum wage because "the majority of their work is not serving-related."

111.    Ms. Hesson's Weekly Time and Attendance records maintained by Abuelo's show that while she worked as a Trainer, Ms. Hesson was paid $6.50 an hour – significantly below the state and federal minimum wage rate for a non-tipped occupation.

112.    In her official capacity as Abuelo's Store #621 general manager, similar to Ms. Brinker, Lacy Coe directed Ms. Hesson to perform services off-the-clock from at least June, 2017 through July, 2018. Ms. Coe would require and instruct Ms. Hesson to clock out and leave the restaurant before the end of her scheduled shift in order to pick up Ms. Coe's two childen from her ex-husband. Had not Abuelo's general manager instructed Ms. Hesson to leave the restaurant, she would have continued working as scheduled and earned additional wages.

113.    Abuelo's failed to pay Ms. Brinker a lawful minimum wage for services she performed at Ms. Coe's direction off-the-clock.

114.    Ms. Coe failed to pay Ms. Brinker a lawful minimum wage for services she performed at Ms. Coe's direction.

115.    Attached as Exhibit 4 hereto and incorporated herein by reference, is the affidavit of Deborah Hesson and attached work papers attesting to the actual amout of time Ms. Hesson worked at Abuelo's during the last three years of her employment.

116.    On March 27, 2020, Ohio Governor Mike DeWine signed into law Am.Sub.H.B. No. 197 (HB 197), which provided emergency relief to Ohioans during the COVID-19 pandemic. HB 197 tolled the statute of limitation in criminal, civil, and administrative actions, including claims pursuant to the OMFWSA. This section applies retroactively to the date of the emergency declared by Executive Order 2020-01D, issued on March 9, 2020, until the expiration of Executive Order 2020-01D or July 30, 2020, whichever is sooner.

## CLAIMS FOR RELIEF

### COUNT – ONE
*(Willful Violation of the FLSA - Underpayment of Wages)*

117.    Plaintiffs restate and incorporate the foregoing allegations as if fully rewritten herein.

118. Plaintiffs each were an "employee" of Abuelo's as that term is defined in 29 U.S.C. § 203(e).

119. While employed by Abuelo's, Plaintiffs were engaged in preparing, ordering, and delivering food and beverages, among other things, in interstate commerce.

120. Under 29 U.S.C. § 206 *et seq.*, Abuelo's was obligated to pay Plaintiffs the federal minimum wage for work they perform at Abuelo's Store #621.

121. Within three years of commencing this action, Abuelo's knowingly and willfully violated 29 U.S.C. § 206 *et seq.* by failing to pay Plaintiffs the federal minimum wage while working in a non-tipped occupation and/or spending a substantial amount of time, in excess of twenty percent (20%) of their shift, performing non-tip-generating duties.

*(Willful Violation of the FLSA - Non-payment of Wages)*

122. A general manager of Abuelo's Store #621 testified in prior cases that as early as 2010, Food Concepts International, Inc.'s Chairman and Chief Executive Officer knew or chose to ignore facts, claims, and evidence that unrecorded time existed and that employees were not being compensated.

123. Abuelo's and Abuelo's Store #621 general managers also knew that although front wait/servers, including Plaintiffs, were arriving to work at or before their scheduled time, they regularly were not clocking in until their first table arrived. This practice and store policy resulted in numerous hours of unrecorded time by Plaintiffs.

124. An Abuelo's general manager testified in similiarcases against Abuelo's that "[c]oncerns were voiced over and over again to everybody" at Abuelo's concerning this unrecorded time. By ignoring and condoning this conduct of servers, including Plaintiffs, not reporting their time off-the-clock time, Abuelo's demonstrates malice or aggravated or egregious conduct that

intentionaled deprived Plaintiffs of earned wages, which Abuelo's and its agents knowingly authorized, participated in, and ratified.

125.     Within three years of commencing this action, Abuelo's knowingly and willfully violated 29 U.S.C. § 206 *et seq.* by failing to pay Plaintiffs the federal minimum cash wage for tipped employees while working in a tipped occupation.

(*Willful Violation of the FLSA - Non-Payment of Overtime Wages*)

126.     Plaintiffs worked at Abuelo's Store #621 more than forty hours in one or more workweeks.

127.     Abuelo's knew, or should have known, that Plaintiffs worked at Abuelo's Store #621 more than forty hours in one or more workweeks.

128.     Abuelo's willfully violated the FLSA, 29 U.S.C. § 207, by failing to pay Plaintiffs one and one-half times the employees' prevailing federal minimum wage for hours worked in excess of forty hours in one workweek.

129.     None of the exceptions under 29 U.S.C. § 207(b), 29 U.S.C. § 213, or any statute or rule apply exempting Abuelo's from its statutory obligation to pay Plaintiffs overtime wages pursuant to 29 U.S.C. § 207(a).

130.     As s result of Abuelo's willful FLSA violations, Plaintiffs are entitled to damages, including, but not limited to, unpaid wages, unreimbursed expenses, liquidated damages, costs, and attorneys' fees.

(*Willful Violation of the FLSA - Failure to Maintain Adequate Records*)

131.     Within three years of commencing this action, Abuelo's knowingly and willfully violated 29 U.S.C. § 516.2 and § 211 by failing to maintain adequate, proper, true, and accurate employee time records, including, but not limited to, accurate hours each employee worked per day, the

total hours worked each workweek, and the duties each employee performed during his or her shift.

132.    Abuelo's does not qualify for an exemption from paying minimum wages to Plaintiffs under 29 U.S.C. § 206, § 213; or any other section of law.

133.    As a results of Abuelo's willful violation of the FLSA, Plaintiffs have been injured in the amount of back pay (without any consideration of collateral sources) as a result of unpaid wages and an additional amount as and for liquidated damages.

134.    As a result of Abuelo's egregious and willfull violation of the FLSA, under 29 U.S.C. § 216(b), Plaintiffs are entitled to recover their underpayment of wages, unpaid wages, and unpaid overtime wages, plus an equal amount in liquidated damages, costs, and reasonable attorneys' fees.

## COUNT – TWO
*(Violation of the OMFWSA - Underpayment of Wages under Ohio Law)*

135.    Plaintiffs restate and incorporate the foregoing allegations as if fully rewritten herein.

136.    Under Ohio Rev. Code § 4111 and Article II, § 34a of the Ohio Constitution, Abuelo's was required to pay all employees, including Plaintiffs, a minimum wage based upon their duties as either a non-tipped employee or a tipped employee.

137.    Plaintiffs were an "employee" of Abuelo's as that term is defined in Ohio Rev. Code § 4111; and Article 2,§ 34a of the Ohio Constitution.

138.    Abuelo's failed to pay Plaintiffs a minimum wage for performing tipped and non-tipped job duties where they performed side work in excess of twenty (20) percent of their shift.

139.    From January 1, 2017 to at least January 27, 2017, Abuelo's paid Plaintiffs $4.05 per hour - $.05 less than Ohio's tipped minimum wage for tipped employees in violation of the OMFWSA and Article II, § 34a of the Ohio Constitution.

140. From January 1, 2019 to at least January 6, 2019, Abuelo's paid Plaintiffs $4.15 per hour - $.15 less than Ohio's tipped minimum wage for tipped employees in violation of the OMFWSA and Article II, § 34a of the Ohio Constitution.

141. Within three years of commencing this action, Abuelo's knowingly and willfully violated the OMFWSA and Article II, § 34a of the Ohio Constitution by failing to pay Plaintiffs the state minimum wage while working in a non-tipped occupation and/or spending a substantial amount of time, in excess of twenty (20) percent of their shift performing non-tip-generating duties for Abuelo's.

*(Non-Payment of Wages under Ohio Law)*

142. Within three years of commencing this action, Abuelo's knowingly and willfully violated the OMFWSA and Article II, § 34a of the Ohio Constitution by failing to pay Plaintiffs the state minimum wage while they performed duties for Abuelo's off-the-clock and while the restaurant was closed to patrons.

143. By failing to pay Plaintiffs Ohio's minimum wage for tipped and non-tipped job duties, Abuelo's willfully violated Ohio Rev. Code § 4111 and Article II, § 34a of the Ohio Constitution.

144. At all relevant times, Abuelo's willfully violated the OMFWSA by failing to maintain complete and accurate records as required by Ohio Rev. Code § 4111.08 ("shall make and keep for a period of not less than three years following the last date the employee was employed").

*(Non-Payment of Overtime under Ohio Law)*

145. Plaintiffs worked at Abuelo's Store #621 more than forty hours in one or more workweeks.

146.    Abuelo's knew, or should have known, that Plaintiffs worked at Abuelo's Store #621 more than forty hours in one or more workweeks.

147.    By under reporting the time that Plaintiffs worked for Abuelo's, either by not recording Plaintiffs' off-the-clock time or because Abuelo's unlawfully reduced Plaintiffs time through punch edites, Abuelo's willfully violated the OMFWSA (Ohio Rev. Code § 4111.10) by failing to pay Plaintiffs one and one-half times the Ohio minimum wage for hours worked in excess of forty hours in one workweek.

148.    As a result of Abuelo's egregious and willfull violation of the OMFWSA, Plaintiffs are entitled to recover their underpayment of wages, unpaid wages, and unpaid overtime wages, plus double the amount of the back wages pursuant to Ohio Rev. Code § 4111.14 and Section 34a of Article II, Ohio Constitution, costs, and reasonable attorneys' fees.

## COUNT – THREE
*(Violation of Ohio Prompt Pay Act – Ohio Rev. Code 4113.15)*

149.    Plaintiffs restate and incorporate the foregoing allegations as if fully rewritten herein.

150.    During all relevant times, Abuelo's was an "employer" within the meaning of Ohio Rev. Code § 4113.15(D)(4) and Plaintiffs were employees within the meaning of Ohio Rev. Code § 4113.15.

151.    Ohio Rev. Code § 4113.15(A) required Abuelo's to pay Plaintiffs all wages on or before the first day of each month, for wages earned during the first half of the preceding month ending with the fifteenth day thereof, and on or before the fifteenth day of each month, for wages earned during the last half of the preceding calendar month.

152.    Abuelo's violated Ohio Rev. Code § 4113.15 by failing to pay Plaintiffs all wages due (e.g., non-payment, underpayment, overtime) to them under the FLSA and the Ohio Constitution within thirty (30) days of their regularly scheduled payday. In violating Ohio Rev. Code §

4113.15, Abuelo's acted willfully, without a good faith basis, and with reckless disregard to Ohio law.

153.    As a result of Abuelo's willful violation of Ohio Rev. Code § 4113.15(A), pursuant to division (B), Plaintiffs are entitled to their unpaid, underpayed, and overtime wages, liquidated damages, and damages in the amount of six percent (6%) of the claim still unpaid and not in contest or disputed or two hundred dollars per violation, whichever is greater.

### COUNT – FOUR
*(Invalid Tip Pool Sharing Arrangement in Violation of the FLSA and OMFWSA)*

154.    Plaintiffs restate and incorporate the foregoing allegations as if fully rewritten herein.

155.    Plaintiffs were employed by Abuelo's in a dual job and regularly spent more than twenty (20) percent of their shift performing non-tipped duties incidental and/or unrelated to their tipped duties and performed duties not listed in the O*NET report for waiters and waitresses.

156.    Within three years of commencing this action, Abuelo's violated 29 U.S.C. § 203(m) and 29 C.F.R. § 531.59 by requiring Plaintiffs and other non-customarily tipped and dual occupation employees to participate in a mandatory tip pool. As a result, Abuelo's tip pool was invalid and Abuelo's was precluded from taking a tip credit under the FLSA and OMFWSA to satisfy its statutory tip attribution against its minium wage obligations.

157.    Abuelo's violated 29 U.S.C. § 203(m) and 29 C.F.R. § 531.59 by failing to inform Plaintiffs of the provisions of their tip pooling arrangement and failed to inform Plaintiffs of their intent to treat tips as satisfying part of the employer's minimum wage obligation.

158.    Upon information and belief, Abuelo's violated 29 U.S.C. § 203(m)(2)(B) by keeping a portion of Plaintiffs' received tips in addition to depositing Plaintiffs' tip share

contributions into an interest bearing account and retaining all earned interested before those funds were redistributed to other tipped employees.

159.    Because Abuelo's operated an invalid tip pool and were not entitled to receive the benefit of a tip credit, Plaintiffs performed work for which they were not propertly compenstated resulting in Plaintiffs being entitled to recover underpayment of wages amounting to the difference between their actual rate of pay and the federal and/or state minimum wage in addition to the full amount of their tip share contribution plus two hundred percent (200%) in liquidated damages for unpaid compensation (*i.e.*, trebel damages) under Ohio Rev. Code § 4111.14(J), costs, and attorneys' fees.

## COUNT – FIVE
### (*Damages Pursuant to Ohio Rev. Code § 2307.60*)

160.    Plaintiffs restate and incorporate the foregoing allegations as if fully rewritten herein.

161.    Ohio Rev. Code § 2307.60 authorizes a civil action for damages based on the violation of any criminal statute.

162.    The FLSA (29 U.S.C. § 216(a)) and the OMFWSA (Ohio Rev. Code § 4111.99) impose criminal penalties for willful violations of the FLSA and OMFWSA, respectively.

163.    By their acts and omissions described herein, Abuelo's willfully violated the FLSA and the OMFWSA resulting in Plaintiffs being injured.  Ohio Rev. Code § 2307.60 permits anyone injured in person or property by a criminal act to recover damages in a civil action, including exemplary and punitive damages.

164.    As a result of Abuelo's willful violations of the FLSA and OMFWSA, pursuant to Ohio Rev. Code § 2307.60, Plaintiffs are entitled to compensatory and punitive damages, costs, and attorneys' fees.

## COUNT – SIX
### (*Federal RICO*)

165.    Plaintiffs restate and incorporate the foregoing allegations as if fully rewritten herein.

166.    Plaintiffs are each a "person" as within the meaning of 18 U.S.C. § 1964(c).

167.    Defendants Abuelo's International LP and Food Concepts International, LP are seperate entities capable of holding a legal or beneficial interest in property and are therefore individually considered a "person" within the meaning of 18 U.S.C. § 1962(c) as the term is defined by 18 U.S.C. § 1961(3).

168.    Upon information and belief, Abuelo's constitutes an "enterprise" within the meaning of 18 U.S.C. § 1961(4) as each corporate defendant is a partnership and the RICO persons who conducted the affairs of the Abuelo's enterprise are its Store #621 general managers and other Abuelo's employees or general partners who either directly or indirectly implemented and/or perpetuated policies that had the purpose or effect of depriving employees of earned wages, unemployment benefits, social security benefits, and other retirement benefits.

169.    The Abuelo's enterprise's unlawful and criminal conduct of shaving Plaintiffs' on-the-clock time and knowingly failing to record Plaintiffs' off-the-clock time when they performed mandatory pre-shift and post-shift side work had the common purpose of increasing Abuelo's financial gain and the anticipated result of not only depriving Plaintiffs of their earned wages, but also depriving them of unemployment benefits, social security benefits, and other retirement benefits.

170.    Abuelo's enterprise's conduct constitutes a pattern of "rackettering activity" within the meaning 18 U.S.C. § 1961(1) as they engaged in wire fraud (18 U.S.C. § 1343) and/or mail fraud (18 U.S.C. § 1341) by sending fraudulent pay stubs, W-2 forms, paychecks, and other documents interstate through the mail and wires in violation of 18 U.S.C. § 1962(c).

171.    Abuelo's pattern of rackettering activity was conducted with the purpose of their own financial gain and was committed within the past four (4) years.

172.    As a result of Abuelo's violation of 18 U.S.C. § 1962(c), Plaintiffs have suffered and continue to suffer damages to be determined at trial, including, but not limited to, loss unemployment benefits, social security benefits, and other retirement benefits.

173.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover trebel damages, costs, and attorneys' fees.

## COUNT – SEVEN
(*Ohio Corrupt Activities Act*)

174.    Plaintiffs restate and incorporate the foregoing allegations as if fully rewritten herein.

175.    Abuelo's was involved in more than two incidents of "corrupt activity" as defined by Ohio Rev. Code § 2923.31(I) as they engaged in, attempted to engage in, conspired to engage in, or solicited, coerced, or intimidated another person(s) to engage in racketeering activity under 18 U.S.C. § 1961(1)(B) by sending numerous fraudulent time records, pay stubs, W-2 forms, paychecks, and other documents interstate through the mail and wires.

176.    Abuelo's was involved in a "pattern of corrupt activity" as defined by Ohio Rev. Code § 2923.31(I) by sending fraudulent time records, pay stubs, W-2 forms, paychecks, and other documents interstate through the mail and wires to numerous employees, including Plaintiffs for at least the last five years.

177.    As Abuelo's senior management and corporate officers were not only aware of but implemented its policy(ies) that front wait/servers should not clock in until receiving their first table, and Abuelo's managers' practice of shaving Plaintiffs' time, punch editing Plaintiffs' job discriptions to a description with a lower wage rate, and requiring Plaintiffs to perform work off-

the-clock, the Abuelo's Enterprise existed separate and apart from the managers and employees which Abuelo's International LP and Food Concepts International, LP acted.

178. As a result of Abuelo's violation of Ohio Rev. Code § 2923, *et seq*., Plaintiffs have suffered and continue to suffer damages to be determined at trial, including, but not limited to, loss unemployment benefits, social security benefits, and other retirement benefits.

179. Pursuant to Ohio Rev. Code § 2923.34 Plaintiffs are entitled to recover trebel damages, costs, and attorneys' fees.

### COUNT – EIGHT
*(Breach of Contract)*

180. Plaintiffs restate and incorporate the foregoing allegations as if fully rewritten herein.

181. In an attempt to attract and retain quality employees, Abuelo's implemented a vacation policy. This policy was communicated to Plaintiffs at orientation and memorialized in Abuelo's human resources manuals.

182. Under Abuelo's vacation policy, after one year of service, an employee is eligble to take one (1) averaged payroll week earned vacation each year beginning on each anniversary date. After five years of service, an employee is eligible to take two (2) averaged payroll weeks of earned vacation each year beginning on each anniversary date.

183. In order to be eligible for vacation, an employee must have worked an average of at least 30 hours per week during the six-month period preceding the vacation request date.

184. By failing to record and recognize all of Plaintiffs' time performing side duties off-the-clock and by unlawfully shaving Plaintiffs' recorded one-the-clock time, Abuelo's artificially reduced the average time Plaintiffs worked in a six month period affecting their vacation eligibility and reduced the amoung of their averaged payroll week.

185.   During a deposition, a former Abuelo's manager testified that the time an employee clocks in directly affects his or her eligibily for vacation.

186.   As a result of their reduced average time worked, Plaintiffs were denied vacation based upon Abuelo's assertion that they failed to meet the eligibility requirements in breach of Abuelo's vacation policy, whereas had Abuelo's recorded and considered all time worked in the vacation pay calculation, Plaintiffs would have been eligible for vacation and/or received greater compensation for the vacations.

187.   As a result of their reduced average payroll week, when Plaitniffs did receive vacation benefits, those benefits were less than the actual averaged payroll week that included all hours Plaintiffs actually worked.

188.   In an attempt to encourage and reward employees who make a long term commitment to Abuelo's success, Abuelo's established a Long Term Employee Recognition Program ("LTE") whereby employees would receive points according to the program's parameters. The points were to be paid out as a cash bonus either (1) on an annual basis in December following a regular year or a year in which there is an IPO or (2) at the time of a Change in Control (meaning the company is sold).

189.   Plaintiffs performed all conditions precedent to the LTE program. However, Abuelo's failed to pay Plaintiffs a cash bonus in accordance with their LTE program in breach of its policy and agreement with Plaintiffs.

190.   As a result of Abuelo's breach, Plaintiffs have been damaged and will continue to be damaged in an amount to be determined at trial, plus, costs, prejudge interest, and reasonable attorneys' fees.

## DEMAND FOR JUDGMENT

**WHEREFORE,** Plaintiffs respectfully demand judgement against Defendants as to all claims, including:

    a. Find that Defendants willfully violated the FLSA, the Ohio Constitution, Article II §34(a), and the OMFWSA;

    b. Find that Defendants willfully violated Ohio Rev. Code § 4111.08 by failing to keep complete and accurate employement records;

    c. Order Defendants, jointly and severally, to pay Plaintiffs back wages and damages due under the FLSA, the Ohio Constitution, Artcle II §34(a), and the OMFSWA;

    d. Award liquidated and/or treble damages to the fullest extent permitted under Federal and Ohio law;

    e. Find that Defendants willfully violated Ohio Rev. Code § 4113.15 by failing to pay Plaintiffs all wages to them under the FLSA and the Ohio Constitution within thirty (30) days of their regularly scheduled payday;

    f. Order Defendants, jointly and severally, to pay Plaintiffs pursuant to Ohio Rev. Code § 4113.15 six per cent of the amount of the claim still unpaid and not in contest or disputed or two hundred dollars, whichever is greater;

    g. Order Defendants, jointly and severally, to repay Plaintiffs' tip share contributions made to Defendants' illegal tip pool, plus liquidated and treble damages;

    h. Order Defendants, jointly and severally, to pay Plaintiffs punitive damages pursuant to Ohio Rev. Code §§ 2307.60 and 2315.21;

    i. Find that Defendants breached their terms of their LTE program and vacation policy in and order Defendants, jointly and severally, to pay Plaintiffs an amount of damages for Defendants acts in breach of contract, including, costs, attorneys' fees, prejudgment and postjudgment interest;

    j. Find that Defendants' breach was in bad faith;

    k. Find that Defendants' actions and conduct complained of herein deprived Plaintifffs of unemployment benefits, social security benefits, and other retirement benefits in violation of federal RICO and the Ohio Corrupt Activities Act;

    l. Order Defendants, jointly and severally, to pay Plaintiffs trebel damages pursuant to 18 U.S.C. § 1964(c) and Ohio Rev. Code 2923.34;

m.  Order Defendants, jointly and severally, to pay Plaintiffs' attorneys' fees, costs, and expenses as provided under federal and state law, including, but not limited to, 29 U.S.C. § 216(b), 18 U.S.C. § 1964, Ohio Rev. Code §§ 2307.60, 2923.34, and 4111.10; and

n.  Award any other legal or equitable relief that the Court deems just and proper.

Respectfully Submitted,

**HALLOWES LAW GROUP LLC**

*/s/ James D. Perko, Jr.*
Donald B. Hallowes (0041526)
James D. Perko, Jr. (0093312)
1010 Jackson Hole Drive, Suite 200
Blacklick, Ohio 43004
Telephone:     (614) 759-4603
Facsimile:     (614) 868-0029
Electronic Mail: Jim@hlglawgroup.com
                        Don@hlglawgroup.com

*Counsel for Plaintiffs*